## Tome's Appeal.

*Dismissed executor, how compelled to deliver to his successor the effects of estate in his hands.*

The Orphans' Court has power to enforce, against the person of a dismissed executor, by process of attachment a decree that he should pay and deliver over to his successor all the goods, chattels, and effects of the estate in his hands.

APPEAL from the Orphans' Court of *York county*.

This was an appeal by Elias Tome from the decree of the Orphans' Court of York county, directing that he be recommitted to the county prison.

The case was this:—

Elias Tome, the appellant, who was one of the executors of Veronica Gable, deceased, filed his first separate account, which was presented to the Orphans' Court on the 18th day of March 1859, and, after being referred to an auditor, the balance thereon was adjusted at $6488.35, and, on the same day, a distribution of that balance among the legatees was decreed by the Orphans' Court. An appeal was taken to the Supreme Court at May Term, 1861, when the distribution was modified as to part, and, with that alteration and a recommendation indicated in the opinion of the Supreme Court, the decree was affirmed and the appeal dismissed at the cost of the appellants. See Appeal of Gable's Executors, 4 Wright 231.

The appellant filed his second account as executor, which was

presented to the Orphans' Court on the 3d day of February 1860, and on which the balance was fixed by the report of an auditor on exceptions made to said court on the 28th day of March 1861, at $3758.13.

On the 26th day of April 1861, on the petition of George Fox and others, claiming to be legatees under the will of Veronica Gable, deceased, a citation was issued to Elias Tome and his co-executor, requiring them to show cause why they should not give security for the performance of their trust, which matter was so proceeded in that on the 31st day of August 1861 they were ordered to give security in twenty days after notice. At a special Orphans' Court, held on the 1st day of October 1861, a decree or order was made by the court, reciting that " proof was made before the said court that a copy of the order and decree of the court, made on the 31st day of August, A. D. 1861, in the matter of the petition of certain legatees of Veronica Gable, deceased, complaining against Michael Gable and Elias Tome, executors of said testatrix, and praying that they may be required to give security, was duly served upon the said Michael Gable and Elias Tome, in the manner directed and required in and by the said order and decree ; and, it appearing to the court that the said executors have neglected to give security as in and by the said decree they are directed and required to do, the court does therefore vacate the letters testamentary granted to the said Michael Gable and Elias Tome, on the estate of the said Veronica Gable, deceased, and award new letters to be granted by the register of wills of the said court ; and the court does hereby further order and direct the said Michael Gable and Elias Tome, and each of them, to pay over and deliver to their successor all the goods, chattels, effects, and estates of the said testatrix in their hands, or in the hands of either of them respectively."

On the 16th of November 1861, a petition signed William L. Keech, and affirmed to by him, was presented to the Orphans' Court, setting forth that he was administrator *de bonis non* with the will annexed of said Veronica Gable ; that as administrator as * aforesaid he had demanded severally of Elias Tome and Michael Gable, her former executors, who had been dismissed from the trust, and since the order of the court was made, the moneys and effects of the said Veronica Gable in their hands, since their dismission as aforesaid, and that they severally refused to comply with said request. On the same day, the court awarded a writ or writs of sequestration against said Tome and Gable, returnable December 12th 1861. On the first of these writs, Tome's interest in a tract of land in Chanceford township was " sequestered and levied" by the sheriff ; on the second, allowed and awarded on the 29th of April 1862, a leather trunk, containing about half a dozen paper writings and papers with calculations

thereon was levied, attached, and sequestered by the sheriff, as already stated, "which property," he, in his return of the said last-mentioned date, said, "I detain and keep under sequestration in my hands."

At January Sessions, 1862, on information previously made by the said William L. Keech, an indictment was preferred against the appellant in the Court of Quarter Sessions of York county, for the offence of embezzlement, charging in the first count that the said Elias Tome, as executor of the said Veronica Gable, did receive and take into his possession a large amount of the assets, effects, and moneys of the estate of the said Veronica Gable, deceased, the same being property then and there held by him, for the greater part, for the benefit of Jacob Gable, John Gable, Elizabeth Gohn, and other persons, unknown, legatees of said testatrix, of great value, to wit, of the value of $12,000, and that the said Elias Tome, with intent to defraud these legatees, unlawfully and fraudulently converted and appropriated to his own use, a large portion thereof, to wit, of the value of $7000, and did unlawfully and fraudulently secrete and dispose of the same with intent to appropriate and convert the same to his own use. The second count charged the defendant with having in his possession as executor a large sum of money, to wit, $10,000, part of the estate of said testatrix, the property in part of the persons above named, and with unlawfully and fraudulently appropriating and converting the same to his own use, and with secreting and disposing of the same with intent to appropriate and convert the same to his own use. The third count charged him with having the like sum of money as executor, and with unlawfully and fraudulently concealing, secreting, and disposing thereof, with intent to defraud the said Jacob Gable and others. At April Term, 1862, to wit, on the 1st day of May 1862, a trial was had on this indictment, and the defendant found guilty. On the 10th of May 1862, the court sentenced the defendant to undergo an imprisonment in the county jail for the term of two years, pay a fine of $1000, pay the costs of prosecution, and stand committed until the sentence be complied with.

On the 26th day of February 1864, the court awarded an *alias* order on Elias Tome to pay over to William L. Keech, administrator with the will annexed of Veronica Gable, deceased, "the amount of the moneys in his hands belonging to the estate of Veronica Gable, deceased, of which he was executor," and the court ordered that the said money be paid within five days of the service of said notice. Endorsed on this order, is an affidavit subscribed and sworn to by Jacob Eichelberger, saying, "On this 26th day of February, A. D. 1864, he served the within order on Elias Tome therein named by reading the same to him, and leaving with him a copy thereof duly certified from the record."

[Tome's Appeal.] ·

This was marked "filed April 5th 1864." On the last-mentioned day an attachment was awarded against Elias Tome by the court, which was directed to the sheriff of the county, commanding him to "attach the said Elias Tome, late executor, &c., so that you have him before the judges of our said Orphans' Court at a court to be held on the 29th day of April 1864, then and there to answer as well touching said contempt in not complying with the said order of our said court, as also such other matters as shall be then and there laid to his charge, and further to perform and abide such order as our said court shall make in this behalf." This writ was returned, "Attached Elias Tome, whose body is in custody in the jail of York county under a sentence of the Court of Quarter Sessions for embezzlement, which has not yet expired."

On the 29th day of April 1864, an *alias* attachment was awarded against him, to which a return was made in the same words, with the sentence of the Court of Quarter Sessions of May 10th 1862, above quoted, added at length. This *alias* attachment was returnable on the 31st day of May 1864.

On the 31st day of May 1864, a *pluries* attachment was awarded, returnable on the 26th day of August 1864, against the said Elias Tome, to which, under date of May 31st 1864, the sheriff made the same return as on the *alias.*

On the 29th day of August 1864, the respondent moved to set aside and supersede the *pluries* writ of attachment in this case, for the following reasons :—

1st. The *alias* rule directing him to pay over to William L. Keech, administrator of Veronica Gable, deceased, contained no statement of the amount of moneys demanded or required to be paid.

2d. The service of the said rule by Jacob Eichelberger was insufficient to found upon it a writ of attachment, said Eichelberger not being the person entitled to receive the moneys and things mentioned in said rule, nor having any authority to do so.

3d. No opportunity was afforded to the said Elias Tome to comply with the order of court in said *alias* rule made.

4th. The said Elias Tome, being imprisoned in the jail of York county on a conviction for embezzlement by sentence of the Court of Quarter Sessions of said county, could not be guilty of contempt against the Orphans' Court in not paying over the moneys or delivering securities, papers, &c., to William L. Keech, who never demanded them under said rule, nor offered said Elias Tome any opportunity to comply therewith.

5th. That the said Elias Tome is not subject to be arrested and taken in execution upon the *pluries* writ of attachment issued in this case.

6th. That the writ of *pluries* attachment issued in this case is

unauthorized by law, a writ of sequestration in the same matter having been previously sued out by William L. Keech, administrator *de bonis non*, &c., of Veronica Gable, deceased, for the same moneys mentioned in said writ of attachment, and execution thereof made by the sheriff.

On the same day, the court fixed Friday, the 9th day of September 1864, at 10 A. M., for the hearing of the motion to quash the attachment, and remanded the respondent to the custody of the sheriff. On the said last-mentioned day, the court overruled the objections to the writ, and ordered the respondent to answer in writing and under oath the contempt alleged against him on Friday, the 16th day of this same month, and stand committed in the mean time. On the same day, counsel for administrator and legatees moved the court to order the recommitment of the defendant to the custody of the sheriff in the jail of York county, for not complying with the order and decree of the court against him in the premises. The order of the court of same date was returned by the sheriff under date of September 10th 1864, served on Elias Tome by reading it to him and handing him a duly certified copy made by the clerk of the Orphans' Court.

On the 19th day of September 1864 (to which time the case had been adjourned by the court from the 16th), a paper purporting to be an answer was filed by Elias Tome, duly affirmed to on the same day, in which, after protesting that he was not bound to answer as required by the order of the court of the 9th day of the same month, no interrogatories nor other particulars, in writing or otherwise, being exhibited or specified as to which his answer was required, and saving and reserving to himself all and all manner of exceptions to the many deficiencies, irregularities, and substantial defects of the proceedings had against him in the matter of the said alleged contempt, and disclaiming all purpose or design whatever to resist the proper authority of said court, or to show contempt to, or disregard its orders and decrees, and showing to the court that by reason of his imprisonment in the common jail since the — day of November 1861, he was unable to answer otherwise than from memory as to any of the matter objected or alleged against him, and being so imprisoned and held in duress, but desiring to comply to the best of his ability with the order of the court in the premises, without surrendering any rights, advantages, exceptions, motions, or reasons assigned why the attachment in this case should not be vacated or set aside, the benefit of which he expressly reserved, for answer to said order, said: "That his aunt, Veronica Gable, died on the 9th day of October 1857, leaving a last will and testament, of which he and one Michael Gable were appointed executors, who duly proved the will, and assumed the trust; that when his aunt died he had scarcely any money, having expended his own and money he had

14 WR.—19

borrowed on a visit he had recently made to Philadelphia, and he borrowed money to pay his expenses when he undertook the duties of executor ; that he resided twenty miles from where the property of testatrix was, and incurred heavy expenses in travelling, boarding, and for clothing, in attending to the business ; that the testatrix, who was blind, left a large personal estate, which was in great disorder, and he gave his whole time and attention to the business, having been engaged forty-six days in preparing her property for appraisement and sale, and examining and arranging her securities and papers ; that he worked earnestly to make the best possible returns of the assets, and collected considerable sums of money, regarded by testatrix as lost, many being barred by limitation and others owed by irresponsible parties ; that difficulties arose in the settlement of the estate on account of a claim preferred by the heirs at law of Frederick Gable, deceased, to the real estate acquired by him after the date of his will, and litigation grew out of that ; that when he filed his first administration account in January 1859, exceptions were made, which caused more litigation, and postponed settlement ; that he believed that he was acting in the line of his duty, both to himself and the interests committed to his care, in that litigation ; that the compensation of counsel cost a great deal, of which he kept no account ; that his health was impaired in travelling, and that he paid considerable sums to physicians, of which he had no account ; that on one occasion he put money and papers, both private and belonging to the estate, in a desk in testatrix's late dwelling, which he locked and kept the key, but when he returned the desk was broken open and the contents gone ; that he paid money to several of the legatees, and others were indebted on the vendue lists, but in his then present situation he could not specify the amounts ; that during the long delay in the transaction of the business of the estate, and following the settlement of his accounts, he was frequently from home at different places to see and consult counsel and on other business, and on these journeys fell into company with individuals among whom he was the loser of large sums of money, which he regrets, but was then unable to replace them ; that he was then unable to pay the money ordered by the court to be paid to Keech, having been imprisoned for nearly three years, and unable to attend to any business, and having incurred and suffered expenses and losses as before stated ; that he had never declared that he would not pay the legatees, or any person legally entitled to receive it, the amount due to them, and the testimony given before the court as to this was erroneous and mistaken, but was desirous and anxious to do so, and would do so whenever he had the ability, but could do nothing on that behalf so long as he was confined in prison. And further averring that he never intended or designed to resist the process or commit any

[Tome's Appeal.]

contempt against the authority of the court, he prayed that he might be discharged from imprisonment under said process of attachment."

On the same day on which this answer was filed, the court issued its writ, directed to the sheriff of York county, in which, after reciting previous proceedings, and that the sum of $10,240.83, with interest, &c., was in the hands of said Elias Tome of moneys of the estate of said Veronica Gable, deceased, whereof $6482.70 was the balance on his first account according to the decree of the court on the 21st day of March 1860, on the exceptions to said account, and $3758.13 on the 28th of March 1861, according to the decree of the court of that date on the auditor's report on exceptions to his second account, the writ proceeded: " Now these are therefore to command you that you take the body of the said Elias Tome and him safely keep in your custody in the jail of said county until he shall pay the said aggregate sums of money, and interest as aforesaid, and shall abide by the orders and decrees of our court on the premises, or such other order or orders as may be made hereafter on the premises, or be otherwise duly discharged according to law." On the same day, the following was endorsed on said writ by the court: " September 19th 1864, Elias Tome having filed his answer to the proceedings against him for a contempt, as ordered on the 9th of September 1864, the court decree the same insufficient, and direct that he be recommitted to the prison of York county for the reasons set out in the within writ."

This appeal was then entered by defendant, for whom the following errors were assigned.

1st. The Orphans' Court of York county erred in awarding a writ of attachment against the appellant in this case, founded on the *alias* order of said court issued the 26th day of February 1864, commanding him to pay over to William L. Keech, administrator with the will annexed of Veronica Gable, deceased, the amount of the moneys in his hands belonging to the estate, and the return of service made thereon by Jacob Eichelberger.

2d. The Orphans' Court erred in not setting aside and superseding the writ of *pluries* attachment issued in this case, for the reasons assigned in appellant's motion made August 29th 1864, and overruled by said court on the 9th of September 1864.

3d. The Orphans' Court erred in issuing its writ or commitment on the 19th of September 1864, directed to the sheriff of York county, commanding him to " take the body of the said Elias Tome and him safely keep in your custody in the jail of the said county, until he shall pay the said aggregate sum of money and interest as aforesaid, and shall abide by the orders and decrees of our court in the premises, or such other order or orders as may

be made hereafter in the premises, or be otherwise duly discharged according to law."

*Cochran & Hay*, for appellant, argued that the Orphans' Court was a creature of the constitution and of the statute. No chancery powers are given to it by the former. Its authority to " grant relief in equity" is derived soley, under the constitution, from the power vested in it by the legislature, and the legislature has fixed bounds for it as to punishment by the summary process of attachment for contempt, by the Act of 1836. It can arrogate to itself no broader or greater powers than are possessed under that head by any other of the courts of the Commonwealth, by virtue of any inherent prerogative which sets it above and beyond the statute. That the law placed so much higher a value upon money than upon liberty, that it will not permit any citizen to be consigned to interminable imprisonment under the pretext of a technical contempt of the Orphans' Court, while it restrains the common-law tribunals in the enforcement of their judgments for money to the property of defendants. That in the order and proceedings upon which the attachment in this case was founded—in the issuing and arrest under the attachment, and the decree of the court committing the appellant to the custody of the sheriff to be confined in jail without day, there was error ; and that the appellant, who has already been the tenant of a cell for three years and a half, having served out the term of confinement to which he was sentenced, should be discharged by order of this court, leaving all the property which he now has, or may hereafter acquire, subject to be levied upon, sequestered, sold, or otherwise disposed of according to law in satisfaction of the decree of the Orphans' Court in the premises : citing and relying on United States *v.* Wayne, 1 Wall. Rep. 134 ; 2 Daniell's Ch. Pr. 706 ; Chew's Appeal, 8 Wright 247 ; 1 Chitty's Crim. Law 462 ; State *v.* Cooper, 1 Green (N. J.) 361 ; State *v.* Shephard, 7 Conn. 76 ; Fiddler *v.* State, 7 Humph. 508 ; Duncan *v.* The Commonwealth, 6 Dana 295 ; Brightly's Equity 534, § 748 ; Estate of Hugg and Bell, 2 Penn. Law Jour. 156 ; Scott *v.* The Jailor, 1 Grant's Cases 237 ; Young *v.* Taylor, 2 Binn. 230 ; Burke *v.* McFall, 2 Br. 144 ; Allison *v.* Rheem, 3 S. & R. 142 ; Bank *v.* Latshaw, 9 S. & R. 9.

*E. V. Keesey, John Evans*, and *John L. Mayer*, for appellees.—In view of the Act of 1832, relating to Orphans' Courts, § 23, and of June 16th 1836, § 19, Bright. 765, there is no room to question the amplest jurisdiction of the Orphans' Court in this case, nor that the writ of attachment was an appropriate arm of its power, as well as the writ of sequestration, nor that it had full

[Tome's Appeal.]

discretion to determine what remedy the case required, as well as the manner of using it, "until the end be fully attained."

The order to pay and deliver to his successor is a part of the decree superseding a defaulting executor. No such decree can be made except upon full notice, and proof of the facts, and failure to give security: Cohen's Appeal, 2 Watts 175. The party against whom the decree is made is in court, and cannot complain of want of notice. No particular sum of money, chattels, or effects are specified in the decree. The dismissed executor is "to deliver and pay to his successor all and every the goods, chattels, and estates in his hands of the decedent," &c.

There is no analogy between this case and a suit in equity *inter partes*. There is no decree adjudging or ascertaining a sum of money to be due. "In contemplation of law, the trust fund at all times remains in specie or invested as required by law, and the money or the proper securities are or should be in a situation to be delivered over at once:" Leaman v. Duryea, 1 Kernan 330. The case is more analogous to an order in chancery on an executor or trustee to pay the funds into court, or to the accountant-general of the court, on which no demand is necessary: 2 Daniel's Ch. Prac. 1251 ; 1 Smith's Ch. Prac. 669.

The appellant did not deny, in his affidavit before the court, on the 19th of September, when he came up to purge himself of the contempt, that there was due service of the order and demand of the money.

The writ of attachment in the first instance is in the nature of *mesne process*, "the sole object of which is to bring the offender into court:" State v. Matthews, 37 N. Hamp. 450 ; McCredie v. Senior, 4 Paige 381 ; State v. Matthews, *supra*; Matter of Vanderbilt, 4 John. Ch. R. 57. "The respondent may submit his contempt to the court upon his own answer in the form of an affidavit, or he may demand of the prosecutor to file interrogatories for him to answer:" State v. Matthews, 37 N. Hamp. 450 ; Hummel & Bischoff, 9 Watts 416. In this case there was no demand for interrogatories.

The *pluries* writ of attachment was merely the last in a series of *mesne process*, to bring the appellant before the court to answer to the contempt charged against him. To set aside the writ, if there had been ground for it, could not avail the appellant, if it appeared at the hearing that he was guilty of the contempt. The writ of attachment on which the defendant was committed contains all the substance necessary for the purpose : Leaman v. Duryea, 1 Kernan 330 ; People v. Nevins, 1 Hill 154. It embodies the particulars which the appellant complains were not in the *pluries* writ.

It is argued that the Act of 1842, abolishing imprisonment for debt on contract, takes away the power of attaching a superseded

executor, who fails to pay over to his successor. There is no contract, however, to enforce between the dismissed executor and his successor in the trust. The case of Chew's Appeal, 8 Wright 247, has fully disposed of the question on this ·point. See also Patrick *v.* Warner, 4 Paige 397. The present is stronger than Chew's case, for there the trustee was not, as such, a party to the decree of distribution, any more than an executor would be. It is said that as he has been convicted of embezzling the funds of this estate he cannot be compelled to pay them over by the process of attachment, because it is a criminal proceeding as well as the indictment for embezzlement, and no man can be tried twice for the same offence. It is only necessary to state this proposition to see that it is no better in law than in morals. The offence of which he has been convicted is a misdemeanor, and the civil remedy never was merged in such cases in the offence. This principle has been extended to felonies by our late criminal code. Act of 1860, § 71, (Bright. 362.)

The " proceeding as for contempt to enforce civil remedies," in the language of the exception in the Act of 1842 abolishing imprisonment for debt, recognises the character of the process as very unlike an indictment for a criminal offence. It may be entitled in the original suit in chancery in which the contempt is alleged, or in the name of The People : The People *v.* Craft, 4 Paige 325. The idea of pleading *autrefois convict* in such a case has perhaps never occurred before to the judicial mind. It is also said that because writs of sequestration were executed, no attachment could be issued in the case. The Act of Assembly provides for writs of attachment with or without sequestration, and for execution and suits at law " at the same time," " until the end be fully attained." If the appellant had shown to the court, when he moved to set aside the *pluries* attachment, and resisted the motion to recommit, that the money had been or could be realized upon the writs of sequestration, it would have been important, and secured his discharge. The mere fact that writs of sequestration were issued and laid upon things of no value, amounts to nothing : Pontius *v.* Nesbit, 4 Wright 309.

As to the idea that the 23d section of the Act of 1836, relative to the powers and jurisdiction of the courts, is a repeal of the Act of 29th March 1832, relative to the Orphans' Court, so far as respects the process of attachment, it is known that both these acts are parts of the code reported by commissioners appointed for that purpose ; and it would be singular if, in the progress of their labours, they should undo their own work.

The appellant does not distinguish between the general power of all courts to punish for contempts in order to protect themselves from insult, disrespect, or other wrong done to the court, and those proceedings excepted out of the Non-imprisonment Act

" as for contempt, to enforce civil remedies :" Commonwealth v. Newton, 1 Grant's Cases 456 ; Williamson's Case, 2 Casey 18 ; Chew's Case, 8 Wright 247.

The insolvent laws are still in force, and open to all debtors not directly relieved by the Non-imprisonment Act ; and if the appellant chooses may he not avail himself of them, and thus put an end to his imprisonment, unless he has forfeited his claim to their benefit ?   If he has, it must be his own fault, and not that of the law, or of those who administer it.

The opinion of the court was delivered, May 24th 1865, by

Agnew, J.—The distinguishing feature of this case, scarcely noticed in the argument of the appellant, is the nature of the original decree under which the proceedings complained of arose. Elias Tome, one of the executors of the will of Veronica Gable, had undertaken the performance of his trust, and thereby come into possession of the effects of the estate.   Having failed to give the security required of him by the Orphans' Court for some breach of duty which we are now bound to believe that court found correctly had taken place, he was dismissed from his trust, new letters were directed to be issued, and in the same decree he was ordered "to pay and deliver over to his successor all the goods, chattels, effects, and estates of the testatrix in his hands." Now this was not a simple decree for the payment of money, but one much wider and more thorough in its operation, and was made under a special provision of law to reach a special state of the case.   Having in possession not only the moneys but the various effects of the estate, including the evidences of debt, documents, and papers necessary to the protection of its interests against claimants, as well as the preservation of claims, the 23d section of the Act 29th March 1832 made it the duty of the Orphans' Court to make this order for delivery as well as payment, at the time of vacating his letters.   The order is necessarily general in its terms and prospective in its operation.   It became his duty, the moment his successor was appointed and qualified, to obey the order by delivering and paying over everything in his hands, so far as he was capable, whether he had settled an account or not. There was nothing to prevent the settlement of an account thereafter, if not already done, nor to prevent him from coming in to make answer to the order, and to ask the intervention of the court, if it became necessary to protect his own interests !   But his duty required him to hand over at once everything to his successor, or to obtain such qualification of the order as the court might deem necessary.   Upon doing neither, he was clearly in contempt, and it became necessary for the court to enforce obedience to its order ; not merely by way of punishment for his contempt, but as a means

of reaching the purpose of the decree, and rescuing the effects of the estate held by him without security.

Now, keeping the nature and purpose of the proceeding in view, all the objections raised to it will disappear. This being wholly dissimilar to the chancery decree for the payment of money, to which we are referred in 2 Daniel's Chancery Practice 703, it is unnecessary it should state a precise sum of money, or state to whom it should be paid, or that the party serving it should be authorized to receive the money. In the state of the case where the order is made, the court is necessarily uninformed of the amount to be paid over, and of the person who will be the successor in the administration ; and some time must, from the nature of the requirement, elapse from the service of the order before the dismissed executor can gather up all the effects to deliver them over. It is unlike an execution or order for money where payment can be made immediately to the bearer of the writ. For the same reasons there was nothing irregular in the *alias* order by the court, after administration had been granted to William L. Keech, directing Tome to pay over the moneys of the estate in his hands to Keech within five days after the service, or in the service of it by a third party. The worst that can be affirmed of the *alias* order is, that it was unnecessary ; but certainly Tome cannot complain that he was again warned to perform his duty, and allowed five days more to do it. But when we reach the attachment awarded against him for his disobedience, we find that it is founded not upon the *alias* order alone, but upon the original decree to which the *alias* is added as the evidence of still greater contumacy. Turning to the evidence of the service of the original order, we find that Keech himself, the successor and authorized party, made the demand and returns upon oath the refusal of Tome to comply. It is true, the *alias* was served by another, but it was unnecessary he should have authority to receive the money, for by the very terms of it five days were allowed for payment, and the command was to pay directly to Keech. The *alias* was therefore not the foundation of the attachment, but a very proper extension of the original decree, if the court deemed it necessary for the benefit and not to the prejudice of Tome.

The objection to the attachment that it is criminal process, and Tome having been convicted and sentenced in the Quarter Sessions for embezzlement of the estate in his hands, imprisonment upon the attachment is a double punishment, is unfounded. Whatever may be the criminal nature of the disobedience which brought him into contempt, the attachment in this case partakes of the nature of a civil remedy to enforce obedience to the decree, not merely to punish for the contempt. The sentence of the Court of Quarter Sessions operates simply to punish for the fraud, but not to restore the estate to rightful hands. It is to the attachment

alone we can look to operate upon the contumacious trustee, who, after dismissal and without visible property, refuses to discover the effects which he conceals.

For this he has not already rendered satisfaction, or made atonement under the sentence of the criminal court. The purpose of the law and the necessity of its enforcement still remain. There is not that identity of charge in which a double conviction consists, and although he has suffered the penalty of his fraud, he must yet yield obedience to the command to surrender all that he withholds, which embraces everything he should deliver as well as pay.

There is more show of argument, though not more real force, in the next objection, that the body of Tome cannot be imprisoned under the attachment. Were it even true that there can be no imprisonment upon an attachment founded solely on a decree for the payment of money, which involves no more than a debt, the answer already given, as to the nature and purpose of the decree, would be sufficient. But if nothing remained for Tome to do but to pay over all moneys in his hands as required in the *alias* order, yet we think the nature of the proceeding exempts it from the operation of the Non-Imprisonment Law of 1842. That act excepts "proceedings as for contempt to enforce civil remedies." I cannot add anything to the force of the reasoning of my Brother Strong in Chew's Appeal, 8 Wright 247, to show that the exception in the act necessarily left all such attachments untouched by the non-imprisonment clause, but the nature of the case now before us brings into view other portions of the act, which strongly enforce his argument. In Chew's case, the order was simply to pay over a distributive portion or sum: but here the order is founded upon an abuse of the trust, and a fraudulent conversion of its funds : for an executor who refuses either to give security or pay over after he is dismissed, stands in the attitude of a peculator of the fund. Now, under the Act of 1842, in a case where *primâ facie* the debtor is not liable to imprisonment, yet if he has "fraudulently contracted the debt or incurred the obligation respecting which suit is brought," or "has property which he fraudulently conceals," or "unjustly refuses to apply to the payment of a judgment" his money or other property, he is liable to arrest and imprisonment until duly discharged by law. These provisions throw light upon the exception of attachments when used to enforce civil remedies, which embrace every variety of ground demanding such enforcement, including all these fraudulent practices : and therefore take in all kinds of derelictions of duty. It would be difficult to define with precision and exactness those attachments which would simply enforce the payment of a debt and no more, and therefore the legislature left all to be

[Tome's Appeal.]

governed by the law as it stood before the Non-Imprisonment Act was passed.

The next objection is that a writ of sequestration had been issued and partially executed; and it is alleged that no attachment could be simultaneously issued and enforced. The argument is founded upon the analogy of a *fi. fa.* and *ca. sa.*, taken out at the same time, but one of which only can be executed. But this reasoning overlooks the difference between the mere common law rules governing execution process and the statutory power of the Orphans' Court, given to enforce obedience to its decrees. The latter is much wider in its reach and more comprehensive in its purpose, requiring a greater liberality in its interpretation. An order to deliver over all effects, cannot be satisfied as mere execution process can be by a sale of property. It may be a just privilege of the debtor to demand that his property seized in execution shall be first applied to his debt, before he shall be called to satisfy it with his person. But where his default is not only that of a debtor, but that of an offender against authority, he stands in a different relation. There, if we examine the statute, we discover a purpose which requires more enlarged power in the tribunal administering this branch of the law. All known remedies at law and equity are given, and the Orphans' Court may afford relief by sequestration, attachment, and common law forms of execution. Its jurisdiction begins by petition and citation, yet in the very beginning and before disobedience to its orders, the 17th article of the 57th section of the Act of 29th March 1832 provides in the case of absconding defendants, or those about to depart from their usual place of abode, that attachment or sequestration or both together may issue. Looking then to this provision to compel an appearance merely, and to the fact that no limitation has been imposed upon the court as to the time of issuing or return of its process, and no intimation of repugnancy between the different forms, we are not prepared to say the Orphans' Court may not award both sequestration and attachment at the same time, and order their execution simultaneously. It is the act of the court, and therefore governed by discretion. The law does not forbid it, and the ends of justice require it. We may refer also to the case of Tams *v.* Wardle, 5 W. & S. 222, and Pontius *v.* Nesbit, 4 Wright 309, as furnishing analogies in practice.

The last objection is that the imprisonment here is unlimited, and therefore contrary to the provisions of the Act of 16th June 1836. But the restriction stated in the 23d section is upon the power to inflict *summary punishment* for contempt of court. This is rendered still more clear by the 24th section, which restricts the punishment of *imprisonment* for contempts to those committed in *open* court. Attachments to enforce civil remedies are plainly not within the enactment, for the reason that they are not used as

[Tome's Appeal.]

punishment, but as the means of remedy: and for the reason that, if within the law, they are wholly abolished. The contempts which are punished by imprisonment are those only which are committed in open court, and therefore all such attachments that operate upon a party for non-performance of a duty *in pais*, or which (as in all these cases) must be performed outside of the walls of the court-room, necessarily cannot be executed by imprisonment. The power to detain the party in jail is gone, and he can be punished only with a fine, which fails of the very object of the writ as a remedy by way of enforcement.

The appellant having filed an answer altogether unsatisfactory, and setting forth losses of the funds of the estate which we can understand in no other way than to refer to losses by gambling, we see nothing in the final order of the court subjecting him to imprisonment, either so irregular or erroneous, as to require correction.

The decree of the Orphans' Court is therefore affirmed.